YATES, Judge.
On July 14, 1995, Military Insurance Specialists, Inc., and James L. Lane, president of MIS (referred to together as “MIS”), sued Life Insurance Company of Georgia (“Life of Georgia”), Union Fidelity Life Insurance Company (“Union Fidelity”), and D. Lynn Taylor, alleging a breach of contract, fraud, tortious interference with a business relationship, misappropriation of trade secrets, and conspiracy. On January 23, 1996, MIS amended the complaint to allege fraudulent suppression and conversion.
On May 29, 1997, Life of Georgia and Taylor moved the court for a summary judgment as to all claims against them. On June 14, 1997, the court dismissed all claims against Union Fidelity pursuant to a stipulation of dismissal entered into between MIS and Union Fidelity. MIS also voluntarily dismissed all claims against Life of Georgia and Taylor except the claims of breach of contract and fraudulent suppression. Following a hearing, the court, on August 27, 1997, entered a summary judgment in favor of Taylor as to these remaining claims. The court also entered a summary judgment in favor of Life of Georgia on the breach-of-contract claim; however, the court determined that Life of Georgia had failed to make a prima facie showing entitling it to a summary judgment on the fraudulent-suppression claim. Thus, it denied a summary judgment as to the fraudulent-suppression claim.
On September 5, 1997, MIS moved the court to certify the August 27, 1997, summary judgment as a final judgment pursuant to Rule 54(b), Ala. R. Civ. P. On September 9, 1997, Life of Georgia also moved the court for a Rule 54(b) certification of *735 the breach-of-contract claim and asked for the statement required for Life of Georgia to seek permission to appeal, pursuant to Rule 5, Ala. R.App. P., from the order denying the summary judgment on the fraudulent-suppression claim. The court granted both motions on September 12, 1997; MIS appealed from the summary judgment on the breach-of-contract claim, and Life of Georgia cross-appealed from the order denying the summary judgment on the fraudulent-suppression claim. The case was transferred to this court by the supreme court, pursuant to § 12-2-7(6), Ala.Code 1975.[1] This court remanded the case to allow the trial court to enter an order in compliance with Brown v. Whitaker Contracting Corp., 681 So.2d 226 (Ala.Civ.App.1996). On remand, the trial court entered an order in compliance with Brown, on February 18, 1998. On July 24, 1998, this court affirmed the judgment of the trial court, without an opinion, pursuant to Rule 53(a)(1) and (a)(2)(A), Ala.R.App. P. See Military Ins. Specialists, Inc. v. Life Ins. Co. of Georgia (“MIS I ”) (No. 2970030), 757 So.2d 488 (Ala.Civ.App.1998) (table).
On October 6,1998, MIS moved the trial court for a clarification or modification of its order entered on August 27, 1997.[2] On October 20, 1998, Life of Georgia renewed its motion for a summary judgment as to the fraudulent-suppression claim and responded to MIS’s motion for a clarification or modification. On December 18, 1998, the court, without making any findings of fact, entered a summary judgment in favor of Life of Georgia on the fraudulent-suppression claim and denied MIS’s motion for a clarification or modification. MIS appealed from that summary judgment, after the trial court had denied its post-judgment motion. The appeal was transferred to this court by the supreme court, pursuant to § 12-2-7(6), Ala.Code 1975.
In reviewing the disposition of a motion for summary judgment, we use the same standard the trial court used in determining whether the evidence before it presented a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988); Rule 56(c), Ala. R. Civ. P. When the mov- *736 ant makes a prima facie showing that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794 (Ala.1989). Evidence is “substantial” if it is of “such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). This court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990).
The record, viewed in a light most favorable to MIS, indicates that Life of Georgia was a subsidiary of ING America Life Corporation (“ING”). Bob St. Jacques was the chief executive officer of ING. The health-insurance division of Life of Georgia was known as the Associated Doctors Senior Services Division. Lynn Taylor was the president of Associated Doctors. Darryl Harris was the executive vice president and chief actuary for Associated Doctors.
James L. Lane is the president of MIS. MIS employed Tom Donahey to develop a CHAMPUS[3] supplement insurance policy. MIS contacted Taylor to inquire whether the Associated Doctors division of Life of Georgia might underwrite the CHAMPUS policy. Following extensive negotiations, the parties entered into an “Exclusive Marketing Agreement” (“EMA”) on July 27, 1994. Pursuant to the terms of the EMA, Life of Georgia appointed MIS as its general agent to recruit and recommend for appointment independent insurance agents to solicit applications for the CHAMPUS policies, which were to be underwritten by the Associated Doctors division of Life of Georgia. Further, in exchange for its development of the policy and its marketing efforts, MIS was appointed by Life of Georgia as the exclusive marketing agent of the CHAMPUS policies.
MIS began working to develop a marketing plan for the CHAMPUS policies. Using contacts that Donahey and Lane had in the military-insurance field, MIS recruited agents across the country to market the CHAMPUS policies. MIS also worked to develop computer programs for the purposes of marketing and administering the CHAMPUS policies.
St. Jacques became the CEO of ING in the fall of 1994. At that time, ING began to evaluate its corporate strategy and to identify its long-term goals with respect to its subsidiaries, including Life of Georgia and Associated Doctors. In January 1995, there were initial discussions regarding possibly eliminating the Associated Doctors division of Life of Georgia and its health-insurance products. On January 12, 1995, a memo was sent to St. Jacques, Taylor, Harris, and others, outlining, as a possible course of action with Associated Doctors, selling its assets and dissolving all its business. Harris prepared an analysis of total expenses allocated to Associated Doctors and a profile of its business as of December 31, 1994, in connection with its possible sale and dissolution.
On February 28, 1995, following a meeting in Atlanta, Georgia, in which St. Jacques, Harris, Taylor, and others were present, the decision to sell Associated Doctors was made. Life of Georgia sought *737 to sell Associated Doctors as quickly as possible. Life of Georgia retained a consulting firm to identify potential purchasers of Associated Doctors, and an actuarial firm was hired to value the business. A number of companies had expressed interest in purchasing Associated Doctors. By April 1997, Union Fidelity had completed what it called a “due diligence” study, and negotiations between Life of Georgia and Union Fidelity were ongoing.
On May 25, 1995, Harris and Life of Georgia held a meeting with Donahey and MIS to discuss a number of administrative issues regarding the CHAMPUS policy. Harris did not inform Donahey at that time that Life of Georgia had decided to offer Associated Doctors for sale to prospective purchasers. Eventually, Life of Georgia decided not to sell Associated Doctors outright, but, rather, agreed that the health-insurance policies would be administered by a third party. On June 29, 1995, Life of Georgia and Union Fidelity executed an administrative-services agreement whereby Union Fidelity would provide all administrative services (such as claims administration, customer service, and agent compensation) related to the management of the health-insurance policies sold by Associated Doctors, including the CHAMPUS policies. On that same day, Life of Georgia, by letter, informed its entire field force of its decision to stop selling health-insurance policies through Associated Doctors. The letter stated that no applications for new business would be accepted or processed by Associated Doctors after July 20, 1995, and that Union Fidelity would take over the administration of Associated Doctors’ block of business.
Both Taylor and Harris testified that although they knew that the decision to sell Associated Doctors as an ongoing concern had been made on February 28, 1995, neither of them informed MIS of this decision before June 29, 1995. In fact, Taylor testified that from February 28, 1995, to June 29, 1995, he had encouraged MIS to continue recruiting agents and marketing the CHAMPUS policies. Taylor further testified that from February 28, 1995, to June 29, 1995, MIS was making progress in recruiting agents and selling the CHAMPUS policies. He stated that sales of the CHAMPUS policies were close to what had been projected.
MIS had heard rumors that Associated Doctors might close. Prior to June 29, 1995, at a meeting attended by Taylor, Lane, and Donahey, Lane asked Taylor what would happen to the CHAMPUS program if Associated Doctors stopped doing business. Taylor responded by saying that because of the success of the program he was confident that the program would be retained by Life of Georgia and would be administered by Life of Georgia. Rod Dunmyre, executive vice president of sales for Associated Doctors, also told Donahey and others at MIS that discussions regarding the fate of Associated Doctors were confidential, but that Taylor had stated that he was confident that “you all are going to be okay.”
Section 6-5-102, Ala.Code 1975, states:
“Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.”
To make a prima facie case of fraudulent suppression, one must produce substantial evidence indicating (1) that the defendant had a duty to disclose a material fact; (2) that the defendant concealed or failed to disclose that material fact; (3) that the defendant’s concealing this material fact, *738 or failing to disclose it, induced the plaintiff to act or to refrain from acting; and (4) that the plaintiff suffered actual damage as a proximate result of acting or not acting. State Farm Fire & Cas. Co. v. Owen, 729 So.2d 834 (Ala.1999). A duty to disclose may arise from a confidential relationship of the parties or from the particular circumstances of the case. § 6-5-102, Ala. Code 1975; Owen, 729 So.2d at 838. Further, a duty to disclose a certain fact may arise from a request for information; however, mere silence in the absence of a duty to disclose is not fraudulent. Jewell v. Seaboard Industrial, Inc., 667 So.2d 653 (Ala.1995); Bulger v. State Farm Mutual Automobile Ins. Co., 658 So.2d 425 (Ala.1995). The existence of a duty to disclose is a question of law to be decided by the trial court. Owen, 729 So.2d at 839. In Owen, our supreme court discussed the function of the trial court in determining whether a party has a duty to disclose:
“The [trial court] should decide whether, assuming as truth all of the plaintiffs factual assertions, they are sufficient to give rise to a legal duty. If, even presuming that all of the plaintiffs facts are true, the [trial court] determines that, as a matter of law, no duty was owed, then a summary judgment or a directed verdict is appropriate.”
Id., at 840. Factors to be considered in determining whether a defendant had a duty to disclose include (1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact suppressed; (4) the plaintiffs opportunity to discover the fact; (5) the customs of the particular trade; and (6) other relevant circumstances. Id.
Life of Georgia argued in support of its initial motion for a summary judgment that it had no duty to disclose to MIS its decision to sell Associated Doctors and to cease taking applications for the CHAM-PUS policies. In its order of August 27, 1997, denying summary judgment as to the fraudulent-suppression claim, the trial court concluded that Life of Georgia had failed to make a prima facie showing that it had no duty to communicate to MIS, a showing that would entitle it to a judgment as a matter of law. The trial court also determined that Life of Georgia had failed to make a prima facie showing that MIS did not suffer any damage as a result of the alleged suppression, again, a showing that, if made, would have entitled it to a judgment as a matter of law. Although the trial court determined that Life of Georgia had failed to make a prima facie showing that would shift to MIS the burden of presenting substantial evidence creating a genuine issue of material fact, the court, nevertheless, noted the testimony of MIS’s expert witness. This witness stated that, in view of the EMA, normal industry standards required Life of Georgia to communicate to MIS on February 28, 1995, its decision to sell Associated Doctors and to cease taking new applications for the CHAMPUS policies, so that MIS would not continue to expend resources in recruiting agents and marketing the policies.

Duty to Disclose

Life of Georgia again argued in support of its renewed motion for summary judgment that it owed no duty to disclose its decision to sell Associated Doctors and to cease taking applications for the CHAMPUS policies because both parties dealt with each other at arm’s length and therefore no confidential relationship existed between them. Our supreme court has defined a “confidential relationship” as:
“ ‘[A relationship in which] one person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other’s interests, or *739 when one person has gained the confidence of another and purports to act or advise with the other’s interest in mind; where trust and confidence are reposed by one person in another who, as a result, gains an influence or superiority over the other; and it appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. It arises in cases in which confidence is reposed and accepted, or influence acquired, and in all the variety of relations in which dominion may be exercised by one person over another.’ ”
Holdbrooks v. Central Bank of Alabama, N.A., 435 So.2d 1250, 1252 (Ala.1983), quoting 15A C.J.S. Confidential (1967). The evidence suggests that at all times the parties were dealing with each other at aim’s length. Further, the evidence indicates that Lane and the other representatives of MIS were experienced and knowledgeable in the insurance field and were capable of protecting their interests in an arm’s-length transaction. MIS argues that a confidential relationship between the parties arises from the EMA, because the parties had agreed to share certain confidential information. MIS has provided this court with no authority in support of this contention. We conclude that the evidence fails to establish that a confidential relationship, as defined in Holdbrooks, existed between the parties that would give rise to a duty on behalf of Life of Georgia to disclose to MIS its decision to sell Associated Doctors and to cease taking new applications for the CHAMPUS policies.
Having determined that no confidential relationship existed between the parties that would give rise to a duty to speak on behalf of Life of Georgia, we must now consider the factors set forth in Owen, supra, to determine whether the particular circumstances of this case would give rise to such a duty. Life of Georgia argued in support of its renewed motion for a summary judgment that the particular circumstances of this case do not give rise to a duty to communicate. Life of Georgia specifically contended that the relationship of the parties was governed by the EMA and that the EMA provided that it may withdraw from sale any policy of insurance upon written notice to MIS. Life of Georgia argued that it had complied with the terms of the EMA by giving MIS written notice on June 29, 1995, of its decision to withdraw from the health-insurance field and to cease taking applications for CHAMPUS policies. MIS again countered with the testimony of its expert Dean Gallaher. Gallaher testified that where a general agent has entered into an exclusive marketing agreement with an insurance company, the insurance company has every obligation to deal fairly with the general agent. He testified that Life of Georgia had a duty to notify MIS on February 28, 1995, of its decision to cease taking applications for the CHAMPUS policies so that MIS would not continue to expend resources on recruiting agents and marketing the policies in furtherance of the EMA. Gallaher testified that this duty arises from the normal insurance standards.
In considering other factors set forth in Owen in determining whether Life of Georgia had a duty to disclose, we note that Life of Georgia had superior knowledge of the fact that it intended to sell Associated Doctors as an ongoing concern and to cease all new business with regard to the CHAMPUS policies. Both Taylor and Harris testified that they knew that the decision to sell Associated Doctors and to cease all new business with regard to *740 the CHAMPUS policies had been made on February 28, 1995, yet neither of them informed MIS of this decision at that time. Taylor testified that he actually encouraged MIS to continue to market the policies. It appears from the evidence that the only opportunity MIS had before June 29, 1995, to ascertain Life of Georgia’s decision occurred when it heard rumors that Associated Doctors might close. Lane asked Taylor what would happen to the CHAMPUS program, and Taylor responded by saying that he was confident that the CHAMPUS program would be retained by Life of Georgia. Dunmyre also told representatives at MIS that Taylor had stated that he was confident that “you all are going to be okay.”
Further, we note that the value of the particular fact concealed from MIS was great. Donahey testified in his affidavit[4] that had MIS been informed in February 1995 of Life of Georgia’s decision it could have at that time approached other potential carriers with its full agency force and nearly $1,300,000 in available premiums to underwrite and market the policies. Do-nahey stated that by not being informed until June 1995 of Life of Georgia’s decision MIS was unable to market the CHAMPUS program to other carriers as an ongoing business, but, instead, had to market it as a start-up business. He stated that this was significant because the underwriting costs of an ongoing business would have been eliminated if the business was marketed as an ongoing concern. Do-nahey further testified that had MIS been informed of Life of Georgia’s decision when it was made, MIS would have been able to offer certain incentives to its agency force so that its agents would stay on board and continue to sell the CHAMPUS policies until another carrier could be found. Donahey stated that as a result of its not being informed of Life of Georgia’s decision before June 29, 1995, MIS lost over one-half of its agency force. After evaluating the factors set forth by our supreme court in Owen, we conclude that MIS presented substantial evidence indicating that the particular circumstances of this case imposed a duty on the part of Life of Georgia to disclose on February 28, 1995, its decision to sell Associated Doctors and to cease taking new applications for the CHAMPUS policies.

Concealment of the Material Fact

MIS presented substantial evidence indicating that Life of Georgia had concealed its decision to eliminate the Associated Doctors division and to cease taking new applications for the CHAMPUS policies. The evidence indicates that initial discussions began in January 1995 concerning the possibility of eliminating the Associated Doctors division and its health-insurance products. MIS presented testimony from both Taylor and Harris that they knew the decision to sell Associated Doctors as an ongoing concern and to withdraw from the health-insurance field had been made on February 28, 1995; yet, neither of them informed MIS of the decision until June 29, 1995. The evidence further suggests that Life of Georgia failed to fully disclose its intention with regard to the Associated Doctors division and the CHAMPUS policies after inquiry from representatives of MIS.

Inducement of Action and/or Nonaction by MIS

MIS presented substantial evidence indicating that as a result of Life of Georgia’s failure to disclose its decision to cease taking new applications for the CHAM-PUS policies it continued to expend resources in recruiting agents and marketing the policies in furtherance of the EMA. *741 Additionally, MIS presented the testimony of Donahey, which indicated that had MIS been informed of Life of Georgia’s decision, it could have undertaken certain courses of action to maintain its agency force and to market the CHAMPUS policies to other potential carriers.

Damage Resulting from Action and/or Nonaction

As previously noted, the trial court stated in its initial order denying a summary judgment on the fraudulent-suppression claim that MIS had conceded at oral argument that February 28, 1995, to June 29, 1995, was the appropriate period within which it had incurred damage. MIS acknowledged in its motion for clarification that that period is the appropriate period for analyzing the liability of Life of Georgia on the fraudulent-suppression claim, but it said that it did not concede that that period is the full extent of time on which to calculate its damage. The general law of torts permits recovery of all damages proximately caused by the wrongful acts of the defendant. Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313 (Ala.1992). The alleged wrongful act in this case, i.e., the suppression by Life of Georgia of its decision to eliminate the Associated Doctors division and to cease taking new applications for the CHAMPUS policies, occurred between February 28, 1995 (the date Life of Georgia’s duty to disclose arose), and June 29, 1995 (the date Life of Georgia actually informed MIS of its decision). MIS can recover only for that damage incurred after February 28, 1995, damage that proximately resulted from its .action and/or nonaetion that was induced by the concealment of the decision to sell Associated Doctors and to cease taking new applications for the CHAMPUS policies. Owen, 729 So.2d at 837.
Life of Georgia supported its renewed motion for summary judgment with Harris’s affidavit, which related solely to the question whether MIS had suffered any damage during the period February 28, 1995, through June 29,1995. Life of Georgia argued that that affidavit entitled Life of Georgia to a judgment as a matter of law on the basis that the affidavit disproved the damage element of the fraudulent-suppression claim.
Harris testified in his affidavit that MIS received $85,659.81 in insurance renewal commissions during the period February 28, 1995, through June 29, 1995, for CHAMPUS policies previously sold by MIS and its agents. He also stated that from June 29, 1995, to the date of the affidavit, MIS had received $245,461.18 in renewal commissions for the CHAMPUS policies previously sold by MIS and its agents. Life of Georgia argues that because MIS had received the renewal commissions and continues to receive the renewal commissions to this day, pursuant to the EMA, MIS has not suffered any damage.
MIS concedes that it has and is receiving the renewal commissions and states that it makes no claim with regard to the renewals. In support of its motion in opposition to Life of Georgia’s motion for a summary judgment, MIS submitted the affidavit of Donahey. In that affidavit, Donahey stated that MIS had incurred a loss of $150,000 in expenses as a result of Life of Georgia’s failure to disclose that it would stop selling the policies. The evidence suggests that these expenses were associated with the start up and development of the CHAMPUS program and were not incurred during the period for which damages might be assessed in this case. Because these expenses were not incurred during the relevant period, they are not recoverable as damages.
Donahey also stated in the affidavit:
*742 “4. [Life of Georgia’s] unilateral firing of MIS’s entire agency force without notice to MIS caused MIS tremendous problems with its agency force.
“5. At the time of the firing of the agency force, MIS had recruited 490 agents, nearly one-half of MIS’s goal of obtaining 1,000 agents.
“6. After [Life of Georgia] unilaterally fired our entire agency force, MIS was able to retain only 200 of its agents in its subsequent attempts to sell the CHAMPUS supplement policies with another. [Life of Georgia’s] actions in firing our entire agency force without warning and without notice to MIS made MIS lose 290 agents from its agency force in its continued efforts to sell an MIS CHAMPUS supplement.
“7. In my experience, an insurance agency force typically loses confidence in its marketing company when that agency force is fired out of the clear blue sky in a letter without notice. That is also obvious as a matter of common sense and could be seen as a natural consequence of the way [Life of Georgia] did the firing.
“8. Moreover, [Life of Georgia’s] actions in firing MIS’s entire agency force without informing anyone at MIS that it was going to do so has also damaged MIS’s reputation and credibility in the industry. When [Life of Georgia] simply terminated the agency force, MIS’s credibility as the developer and finder of the CHAMPUS supplement product and as the developer of the delivery system to the customer for the product was hurt. This is because it is difficult to convince other potential underwriters that [Life of Georgia] would have simply fired the entire agency force and terminated the product line unless there was something wrong with the product.
“9. Had MIS known in February or March 1995 that [Life of Georgia] was going to terminate its entire agency force and stop selling new policies, MIS would have been able to do a number of things differently. First, it would have been able to refocus its marketing strategy to the agents so that the agents would have had a greater economic incentive to stick with the CHAMPUS supplement product line even if it was moved from [Life of Georgia] to another underwriter.
“10. MIS had long planned that when it reached an agency force of 1,000 agents, it would begin packaging with the CHAMPUS supplement product a life insurance product that it had available so that the agents would be able to make money not only for the CHAM-PUS supplement product but also from the sale of the life insurance product. I had discussed this with Lynn Taylor and Rod Dunmyre of [Life of Georgia],
“11. Life Insurance products are typically more lucrative for agents and the availability of a life insurance policy to be sold in connection with the CHAM-PUS supplement would have made it more lucrative and attractive for an agent to sell the CHAMPUS supplement.
“12. If MIS had known of [Life of Georgia’s] plans in February or March, it would have immediately added the life insurance product to help keep agents selling the CHAMPUS supplement product. Taylor and Dunmyre thus misled MIS qn this point, as well, and that caused MIS to fail to pursue adding the life policy at that túne.
“13. Finally, if [Life of Georgia] had informed MIS of its intentions, MIS would have been able to market its product to other interested carriers as an ‘ongoing book of business’ with near *743 ly $1,300,000.00 in premiums already available to the new underwriter. As it was, MIS only found [out] about the termination of the sale of new policies and the agency force at the time it was done.
“14. That meant that MIS was trying to market the concept not as an ongoing book of business but instead as a start up business with an agency network. That is significant because the underwriting costs of an ongoing book of business, such as the CHAMPUS supplement policy, would have been eliminated if sold or marketed as an ongoing concern. The way [Life of Georgia] handled the situation by not telling MIS anything about the termination of the sale of new business and the firing of the agency force left MIS absolutely unable to market the supplement as an ongoing product. Instead MIS essentially had to go to new underwriters asking them to start the product from scratch and absorb underwriting costs already paid in the CHAMPUS supplement policy. That created a tremendous difference in the marketability of the program that MIS had developed.
“15. The biggest problem we had was trying to explain to prospective carriers why, if the product was good, [Life of Georgia] jumped out of it the way that they did. It could have caused a positive difference in the marketability of the program if [Life of Georgia] had told us of their plans to terminate the sale of new business and the firing of the entire agency force and MIS could have then approached carriers with 490 agents and nearly 1.3 million dollars in new business to market and underwrite the product.”
MIS argues that it was damaged as a result of Life of Georgia’s failure to disclose, because, it says, it suffered a loss of profits by the reduction of its agency force and the diminished value of the CHAM-PUS supplement.
We conclude that MIS presented substantial evidence creating a question of fact as to whether it was damaged as a result of the alleged suppression by Life of Georgia. MIS is not required at this point in the case to prove all the damage it suffered- — -it is required only to present substantial evidence indicating that it was damaged. The assessment of damages is left to the discretion of the jury. See Hickox v. Vester Morgan, Inc., 439 So.2d 95 (Ala.1983). Where there is a factual dispute as to whether a party has been damaged, or whether, if so, the damage was proximately caused by the acts of the defendant, it is within the province of the jury to resolve the conflict. See Pacheco v. Paulson, 472 So.2d 980 (Ala.1985); Sizemore v. Patel, 702 So.2d 172 (Ala.Civ.App.1997). Accordingly, the judgment is reversed and the case is remanded for further proceedings.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
MONROE, J., concurs.
ROBERTSON, P.J., concurs in the result.
CRAWLEY and THOMPSON, JJ„ dissent.

. Life of Georgia’s cross-appeal was dismissed on July 17, 1998.

. In its August 27, 1997, order denying summary judgment as to the fraudulent-suppression claim, the court stated, with regard to that claim, that MIS had conceded that the period February 28, 1995 (when MIS contends Life of Georgia had a duty to disclose), to June 29, 1995 (when Life of Georgia informed MIS that Life of Georgia would cease issuing policies), was the period within which MIS incurred loss or damage. MIS stated in its motion for clarification that that period is the appropriate time period for analyzing the liability of Life of Georgia on the suppression claim, but that it did not concede that that time period is the full extent of time on which to consider its loss or damage.
In its order entered on February 18, 1998, in compliance with Brown, the trial court stated that it entered a partial summary judgment in favor of Life of Georgia on MIS's claim alleging fraudulent suppression and, in so doing, confined MIS’s claim of damages for fraudulent suppression to a three-month period, February 28, 1995, to June 29, 1995. The trial court could not properly enter a "partial” summary judgment on a single count of fraudulent suppression. A prima facie case of fraudulent suppression either exists or it does not exist. In its brief, Life of Georgia refers to this "partial” summary judgment as being entered by the trial court and affirmed by this court in our memorandum of affirmance without opinion of July 24, 1998. That affirmance should not be interpreted as affirming the "partial” summary judgment purportedly entered by the trial court on MIS’s claim for fraudulent suppression. The merits of the summary judgment as to the fraudulent-suppression claim are properly before this court for the first time in this appeal.

. The Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) is supplemental insurance that pays for health services received by non-active-duty beneficiaries — typically, military retirees and the dependents of active-duty personnel — in civilian medical facilities.

. Donahey's affidavit is set out at length later in this opinion.